Devoe v. Davis Lorie Davis, III v. Lorie Davis, III v. Davis Mr. Pretzer? Yes. Good afternoon. May it please the court, Seth Pretzer and Carlo D'Angelo for the appellant Devoe. Mr. Devoe seeks a certificate of appealability on an issue at the intersection of several different legal doctrines. I would like to begin my argument today by overviewing at least three of the parameters which limb our position. As an initial matter, it must be understood that Mr. Devoe does not contend that there is an independent and freestanding claim of ineffective assistance of state writ counsel unhinged from any underlying deficiency by his predecessor. Second, Mr. Devoe does not contend that there is a due process right to be competent during habeas, even though the professional rules require writ counsel to visit with their client. Of course, both state and federal courts regularly pay appointed lawyers for doing this. And third, Mr. Devoe does not contend that habeas proceedings can be stayed indefinitely pending restoration of competence. The issue remains, or the question remains, what happens when the state writ counsel knows that a client is not competent to assist them in developing the contentions for the state writ, and necessarily there is some quantum of evidence that writ counsel cannot ascertain for his habeas investigation because it can only come from the mouth of the client. Now, I can understand that this might not be a concern for contentions sounding purely in record-based claims, such as ineffective assistance of appellate counsel. But that concern becomes pronounced and paramount when one is dealing with claims that necessarily involve outside-the-record claims, most specifically and most obviously Wiggins. Now, in the case here, I would like to direct the Court's attention to page 112 of Judge Sparks' memorandum opinion, where he said, quote, the overwhelming majority of the purportedly new evidence identified by the petitioner in his first state habeas corpus application and the exhibits attached thereto was repetitive of the evidence actually presented during petitioner's trial and, therefore, cumulative in nature. And that's the problem, is that it was repetitive of what happened before. If you look at pages 305 to 315 of our second amended writ, we put forth ample material that had appeared in the state habeas file showing that Mr. DeVoe had been repeatedly tested, once by the TDCJ psychiatrist or psychologist and another time by somebody that the state writ council had employed to see if he was competent, and we knew that he was not. Where this becomes important is that often state habeas petitioners or people in prison have had nightmarish personal situations that maybe, especially in their youth, that would necessarily have arisen outside of the record. In other words, how can somebody incompetent like Mr. DeVoe tell his federal writ council but his state writ council what he told the trial council and what they may have been omitted? That's what would not have been repetitive. Mr. Kretzer, is this relevant to your denial of the funding? What is this relevant to? You told us what it wasn't relevant to. Yes. Can you tell us what it is relevant to? Sure. No, it's not denial of the funding request. That was more specific in this case what we appealed on with regard to Mr. Merlis. That was a different claim. This is with regards to points of error 5 and 6 of our opening brief, which were derivative of claims 9 and 10 in our second amended writ. Where this becomes important, Judge Elrod, is that it's our position that what the state habeas lawyer defaulted was what he needed to do was to ask to stay the state habeas proceedings until the point in time that Mr. DeVoe regained competence. Because that affected, what that burdened, was the Wiggins claim. In other words, the Wiggins claim was deficient. What needed to be reinvestigated was the Wiggins claim. And how can we know what Mr. DeVoe told his trial lawyer that was not included? So that becomes relevant. In other words, and Judge Elrod, this is the same arguments, or largely the same arguments that we made in the successor writ. Judge Sparks granted a stay in the bay motion that we filed. And I filed a successor writ in Travis County. And we made a lot of these same arguments. And, of course, we were denied on postcard denial in January of 2016 on the Section 5 bar. So it's our position that's procedurally defaulted. So before we get to the Martinez-Trevino analysis, first we have to establish what it was that needed to happen down in the state habeas and the successor deficient performance by the trial counsel claim. Having established that, the question is why was this defaulted and how should it now be reviewable in federal court? And that's where our Martinez-Trevino arguments. The legal paradigm is twofold. First, there has to be an underlying deficiency or series of deficient performances. And then, separately, for it to be cognizable in federal court to get around procedural default doctrine, then we would get into the Martinez-Trevino dimension. Okay. So you rise or fall on Martinez-Trevino on this claim? Yes. It's a claim to begin with. Right. Because you concede and agree with the district court that the claims that you want to develop are procedurally barred. Yes. And you concede that new evidence gleaned through the assistance, his assistance after he became competent, couldn't be used to review claims adjudicated by the state court. It couldn't be. You can't go back and get a do-over for what was adjudicated by the state court  No. It would have to be things that were omitted. Exactly. So it's rises or falls on Martinez-Trevino. Yes. If we get through the first hurdle, then obviously to get it heard in federal court, we would have to get satisfied the Martinez-Trevino framework before Martinez-Trevino. These would not have been able to be brought to no vote in federal court because we're not under some other cause and prejudice exception like Brady. Help me factually with something. Yes. Okay. He was competent at trial. Yes. Originally, he was held to be incompetent. He was sent, and less than a month later, I think he went in January of 2009 and February. If I'm wrong on the days, Mr. D'Angelo will let me know. But pretty quickly, he was allowed to be restored to be competent for the trial. Then, and we know this, and there's several mental health professionals who evaluated, and we quoted them at length at pages 305 to 315 of our amended writ, he lost competence once he was convicted and sentenced to death. So that's that we know as a parameter that he was not able to assist the state habeas counsel. And when I first went and met Mr. DeVoe in early 2014, I can warrant to the court, as I said in my affidavit, that I have fixed or attached to the successor writ application that he could not communicate with him intelligibly. Okay. But it has to relate to one of your actual claims. Yes. Yes. Most strongly, that impinges on the Wiggins claim. In other words, and Judge Sparks went through. So what about the fact that a lot of this evidence that you're saying should have been uncovered and used as mitigation would be double-edged? In other words, it might help think the jury he was actually more dangerous, harping on all these problems he had, like his abuse, drug abuse. Yes, Judge Scott. So I think that probably hits infinite regress, though. I mean, there's very pure, unalloyed mitigating evidence. We're dealing with people who've engaged in a series of violent conducts. I mean, you could say anything. Well, what's the mitigating evidence that should have been presented? And what's the best type that should have been presented that wasn't? Again, I can't tell you what it is, like a known unknown. Because of this lack of. Sure. For example, Judge Costa and Judge Sparks' order goes through this in some detail. At the trial, they presented some live testimony of certain family members and his mother and another they had put through video testimony. Their health wouldn't permit them to travel to the trial. They lived in New York. And what happened there was the family was used to humanize Mr. DeVoe. I think that's the exact words Judge Sparks used. Well, imagine, for example, that those family members had sexually abused Mr. DeVoe, as is often the case in these death penalty situations or some other nightmarish situation. In other words, no longer would the family members be used to humanize him, but those might be the people who we could say these are the ones who were the victimized. But this is totally speculation. You're not saying that this happened to him. That's correct, yes. That's correct. I'm using it as an example. So how do you establish prejudice for a failure to investigate it in the posture we're in now? I mean, you're saying because of the incompetency you're not allowed to, but how does that get you to ineffective assistance of trial counsel? Sure. In other words, all that could have happened was that the writ counsel, as Judge Sparks correctly observed, what he did in his state habeas wiggins contention, was largely duplicative of the wiggins material that had been adduced. He sent some investigators out to talk to other family members. Again, how do we know what Mr. DeVoe had told his trial counsel? It's our contention what the state habeas lawyer needed to do, having known that he was not able to communicate with Mr. DeVoe during the state habeas proceedings. And then separately, we know that Mr. DeVoe was somebody who had regained confidence before and might likely do so again, that under those circumstances, he should have moved to stay the habeas proceedings just to get that necessary quantum information. And that's required even in a case like this one where the initial investigation was so good, so thorough? You say thorough, sure. That's, I mean, is it, I mean, DeVoe's counsel's investigation includes, his counsel retained an expert to investigate every aspect of DeVoe's life, right? Yes. And after the expert's out of the picture, he independently interviewed DeVoe's family members. Someone, yes. This is much more thorough than many cases that you are the lawyer on, isn't it? Oh, yes. So, it's much, very, very thorough. So, because there's this unknown possibility that there could be something else out there, you believe that that entitles you to a COA? And what case says that? Let me answer your question, Judge O'Rourke, in two prongs. First, yes, there's no doubt there was mitigation done here, and unfortunately there are still many death penalty cases across this country where there is very bad mitigation done. But that's, like so many things, is largely a function of the facts of the case at issue. This Mr. DeVoe's case, that is, is not a case where it was likely to be won at guild's innocence. This wasn't somebody who was a question of whether or not they were legally responsible for a death-eligible offense. The entire battle was going to be at punishment phase, for all intents and purposes. So, for that reason, the fact that there was mitigation, maybe even good mitigation, relative to other mitigation cases that this Court deals with, doesn't mean that necessarily it was the complete amount of mitigation that was available. Layered on top of that is the fact that Well, what is this good mitigation? I mean, there was this thorough investigation. I haven't heard what the good mitigation is, other than speculation. That's correct, because we have not been able to meaningfully communicate. That's why our argument just isn't pure Wiggins claim, Judge Costa. It's what happened here, the defaulted claim that did not appear in Habeas, what needed to happen was the state Habeas lawyer needed to stay the proceedings at least until the point that Mr. DeVoe regained count. But you can't attack state Habeas counsel for being ineffective, either on its own or as cause. Well, given that the Supreme Court refused to extend Martinez even to direct appeal on effectiveness. That's correct. Let alone state Habeas on effectiveness. Right, and there was no ineffective assistance claim. For instance, an ineffective assistance, a freestanding, unalloyed, independent, ineffective assistance of state Habeas counsel claim would be like, you know, he missed a deadline or he left the brief at the FedEx and they didn't pick it up, something like that. What the Supreme Court was very clear in DeVoe was that, yes, you can attack, there has to be deficient performance by state Habeas, but it needs to be appended to an underlying deficient performance of the trial counsel claim. And, in fact, one of the things they said in DeVoe, one of the reasons they were comfortable not extending the doctrine, the procedural default doctrine, to the other context of ineffective assistance of appellate counsel was they thought pretty much any IAAC claim would likely have already been or had some beginning, some genesis, in a deficient performance by the trial counsel. I've gotten a little lost here. Are you claiming that he was incompetent to assist trial counsel? No. Okay. You're saying he was incompetent to assist appellate state Habeas counsel? State Habeas counsel, yes. How long has he been incompetent to assist counsel? Well, I mean, he's never been competent to communicate with Mr. D'Angelo. So what are our expectations that he will become competent to assist counsel? Yes, he did. Those are actually. Well, how many years are we talking about now? I'm not a psychiatrist. I can't, I don't know how to tell you. How long do we think he's been incompetent to assist state Habeas counsel? I know that he was incompetent during the state Habeas. I mean, we know that definitively from the experts. How many years from then? That was 2011, I believe, and I'll get the exact date. And do we have any reason to think he's been competent since then? No. So what are we supposed to do? What are you asking us to do? Well, we asked for, and we were denied by Judge Sparks' funding, to have him tested for competence at the time. And then, of course, we asked for that when we, in our stay in the Bay and our successor, Ritt, we asked the state court for the same thing. All we would point out here is that, unlike situations where the issue there in the Ryan v. Gonzalez case in the Supreme Court in 2013, where there was no possibility that someone would ever regain competence, here we have somebody who did regain competence. What are you asking us to do? When I'm asking this court to issue or grant a certificate of appealability on the defaulted claim that the state Habeas lawyer should have moved to stay the proceedings as an appendix. And so we say, oh, he should have, but now we've gone six years and he still hasn't regained competency. Where does that leave us? Well, sure. He moves to stay. Let's say that had been granted. He's still incompetent. Does that mean the state can't, we're just, state Habeas is in limbo until he maybe dies? Oh, no. How long are we supposed to wait is what I'm getting at. Sure. Obviously we're not asking this court to simply hold the appeal open pending restoration of competence. For example, in Judge Sparks' order granting the stay in the bay, he put a very regular deadline. We had to update the court. I think it was every 45 days or something like that. That's what I meant. You write the opinion. What do you want us to write? What do you want us to order this? What do you want us to say? Sure. Well, all the order would need is the opinion, and this court would need to say was that Judge Sparks was incorrect as to that cause determination. Separately, there could still be new arguments made about whether or not there was prejudice, and that would have to be developed, and perhaps we could move for additional, under the rules it would allow you to move for additional discovery. Well, how do we show prejudice if he hasn't regained competence? I just see this as a circular argument. Maybe I'm missing something. I'm just trying to get at what it is ultimately is going to happen here. Under your view of the case. Sure. All we're asking for is for this court to at least grant the COA so that we would be allowed to go back to Judge Sparks, to then he could have a hearing, he could grant additional discovery, whatever vehicle he would choose to see in his judgment would be appropriate there. Discovery for what? To determine what Mr. DeVoe told the trial lawyers. We could answer this question, the one that I can't answer for you at this moment. You can talk to the trial lawyers. Sure. You've been able to do that the whole time. Yes. I'm confused. Why would granting the COA send it back to Judge Sparks? If we grant the COA, then we have to decide the merits of the issue. Sure. I apologize. I'll get to the merits. Let's say what is it? Assume we grant you a COA. What is it you want to happen? That's where I'm lost. Sure, and I apologize if I misunderstood the question. I thought you meant what was the specific belief I was standing here for asking. If we get COA and then we got to the merits stage, what we're asking to do is to then obviously if we were to prevail there on the merits, we'd be to send it back to Judge Sparks to say that at least the claim was cognizable in federal court. What claim? The default. State counsel should have moved for a stay pending his regaining competency. That's correct, yes. Okay, now we know that he hasn't been competent for six years. So what's supposed to happen now? Well, there's always, of course, the possibility that he could regain competence. How long are we supposed to wait? That's my question. The district court could fashion just like he did in the order where we had to give regular updates to the court when he granted a successor writ. Do we put an end date? Do we give it a year, two years, five years, ten years, 15 years? How long do we wait for the competency to perhaps return? You know, Judge Owen, I think I remember I was looking at the Ryan. When I shepherdized Ryan, I was looking to see how other courts had treated it. I do recall one court in California, and, again, I'll have to get a supplemental 20H. I don't have it in front of me. I want to say they said that that judge was willing to indulge a period of ten years. But, again, I'm remembering I would have to. I don't want to mislead the court in any way. And we're going to wait ten years to find out if the vote told his counsel something that could have helped his trial counsel do better. Even though we think his trial counsel did, on its face, did a good job. I mean, there's not anything that shows he didn't do what the normal things would have been required. Well, Judge Owen, there's no doubt. When Wiggins was first decided, I understand there were a large number of cases in this country where there was literally no mitigation whatsoever put on. Then it's certainly not the rule that simply a trial lawyer goes and does some mitigation that it sort of, you know, obviates that. I didn't mean to butt into the question, so you answer her question, Judge Owen's question, please. I'm sorry. Judge Owen asked you a question that I piled on. Oh, okay. I apologize. So can you answer her question? Sure. I just want to make sure I'm answering the question directly. I think a period of ten years in a case where someone's life is on the line, literally and figuratively, would not be certainly excessive, or compared to the pendency of a large amount of death penalty litigation, which has gone on for decades, would not be excessive to see if Mr. DeVoe can regain competency. In terms of, you know, judicial discretion, oversight, not letting something slip through the cracks, there's no reason that the district judge couldn't fashion an order that Mr. DeVoe be tested once a year to see if he's reached that point. Okay. We've taken up your time on that issue. Are there other issues you want to? Can I ask one more question? Doesn't Ryan teach the district court should not grant a stay where there's no hope of regaining competency? Yes. Ryan says where there's no hope of regaining competency, but it's very important, Judge Elrod, the very last sentence of that opinion, specifically an opinion that had said the Ninth Circuit and the Sixth Circuit were sort of on the fly, specifically said it's different where there is an expectation that someone will regain competency. But there's no evidence before us that there's some expectation. So there's nothing here that says to the contrary. Well, respectfully, Judge Elrod, I would disagree. I mean, even the Court of Criminal Appeals, in their opinion, pointed out, what's obviously in the pleadings index of the trial, that Mr. DeVoe had originally been found to be incompetent and then was sent to the mental hospital or whatever and was sufficiently regained competence. The fact that he did it once before certainly means that he could do it again. I mean, it happened historically with the same person and presumably the same psychotropic medication. He's not bid on any? Now, I don't know what all medications he's been on recently. I mean, we moved to stay in a bay after we had our first meetings with him two and a half years ago, but I'd have to do a hip release and get that supplementally to the court. I can't tell you that. I don't know. I assume you led with this because you thought this was your best of the issues, right? Well, yes, and obviously I love all of my issues, and we wouldn't present them if we didn't think they were strong and meritorious, but I thought this was the one that was likely the one that was of most interest to the court. So what would a COA say? Sure. Well, I mean, a COA at the minimum would say that jurisdictive reasons could debate the issue. What is the issue? Debate what? The issue is whether or not state habeas counsel was deficient for not moving to stay, the state habeas proceedings when he knew that his client was incompetent, and we have demonstrated that in the record, specifically as to whether or not state habeas counsel was able to actively reinvestigate the Wiggins claim. In other words, state habeas counsel substantiated or presented a Wiggins claim knowing that he could not communicate with the client about what that client had told the very trial lawyer that the state habeas counsel was incompetent. That's what the COA would be narrowly focused on, whether or not jurisdictive reason could debate that claim. I have a quick question on the funding issue. Yes. The Supreme Court's granted cert in the ISDIS case from our circuit, which is a funding case where I think looking at the briefing, the issue is largely how much can you prejudge the merits in a funding denial. What, if any, impact do you think that decision could have on the funding issue here where Judge Sparks gives three different reasons for denying funding? Yes. I think specifically one of the issues regarding the testimony as prejudging of A.P. Merillat is that A.P. Merillat, who had been reversed at least twice by the Court of Criminal Appeals for his testimony around this state, was talking about a very abstruse subject area. Most lawyers, I'll speak for myself, before I started dealing with Mr. Merillat, I did not know about prison classification and stories about violence in the prison. That's what would require somebody who is also working in the Texas prisons to look at his testimony and say, here's what you might most want to strongly present. So the fact that we would argue, Judge Costa, that ISDIS is uncertain, those are those arguments that Mr. Kovarski is making, but the fact that you have here somebody, the expert, a punitive expert who had been reversed in at least two other cases is probably enough justification to get the funding. And we're very clear in that funding request. But on an exhausted issue, aren't you limited to the state court record? And that was an exhausted claim, at least the portions of it. Maybe not the Brady part, but the other portions. Right. Yes, that would be exhausting. Again, all we were asking for funding for the expert to do was to take Mr. Merillat's testimony, in this case, the transcript of his testimony in this case, and tell us if he thought there were areas that were incorrect. I would not have asked the expert to do any legal analysis comparing it to Velas and Estrada. That would obviously be truly a job for Mr. D'Angelo and myself. When you come back, can you talk about Davila and why it doesn't foreclose your extension of Martinez-Trevino that you would have to have in order to make the argument about Wiggins that you started with? Yes, only though Mr. D'Angelo is doing well. Oh, that's why you told us that. Yes. Well, Mr. D'Angelo will have his hands full with that, then. Yes, he can tell you all about it. Okay, thank you. I've spoken enough about Davila this year, and I want to hear the second one about that. May it please this Court, Carlo D'Angelo on behalf of the petitioner, Mr. DeVoe. I would like to, and I understand where the Court is going, whether Davila essentially cuts this claim at the knees. Mr. Kretzer presented oral argument in Davila, and I think he's very well suited, and he will be back on rebuttal, I think, to address that, and I certainly don't want to take his thunder because he's put the lion's share this year into working that claim. I would like to address some of the questions that were raised. With respect to what more could have been done in investigation in this case, the Texas Rules of Professional Conduct for Attorneys explicitly say that a state habeas attorney cannot simply rely on what the trial attorney did. The state habeas attorney needs to investigate the case from the ground up. So, albeit there are very, very complimentary things being said about what Mr. Weber did in the trial investigation in this case for mitigation work, when state habeas counsel comes into this case, and we've cited in the record that his own mitigation expert that he hired to reinvestigate this case as he's ethically bound to do, goes to the prison, interviews Mr. DeVoe, and comes to the conclusion it's impossible to communicate with Mr. DeVoe, impossible to communicate with him. For state habeas counsel then to continue to plunge forward and conduct a presumable reinvestigation of the case, knowing full well that the client, and I would equate this to an analogy. Imagine if you had a client who spoke only a foreign language, Spanish. You had a state habeas lawyer who spoke no Spanish, but every time that state habeas lawyer met his client at the prison, did not bring an interpreter, just let the client talk. But you've done an investigation from the ground up now, haven't you? Well, we can't, Judge, because we're in the middle of a job with all kinds of new stuff. Where did that come from? We're very much hamstringed by the pinholster holding that we cannot. We did, and to answer your question, Judge Costa, and to kind of touch on what you're saying, Judge Owen, we did ask for funding to have Mr. DeVoe evaluated in our motion for stay. That request for funding was denied. To answer the ultimate question. But that's not before us now. It is not before, but it is before in this claim in the sense of. Well, you're making a very compelling, seemingly compelling argument that state habeas counsel didn't do a great job. But how is that not an argument that state habeas counsel was ineffective, which is not a recognized claim? You tell me the label you want to put on this claim, because I'm having a hard time figuring out how it's not ineffective assistance of habeas counsel. You know, it's an evolving doctrine. Clearly the Supreme Court rejected in a very discreet application. We are seeking a very unique application in this case. This is by all intent a first impression issue. Whether a defendant who is incompetent at a state habeas stage and cannot assist his counsel, whether that defendant is entitled to the benefit of counsel. I understand that the Supreme Court has expressly limited counsel and the right to counsel to the trial court level, but Martinez is a doctrine which is evolving, and it's being challenged, and it's constantly being attacked. It's just limited in June. It was limited, and I acknowledge that. But I think we can overcome to a certain extent that limitation because this ties back to what trial counsel did or failed to do. When you have a defendant who cannot explain to his state habeas lawyer what my trial counsel and I discussed and what my trial counsel failed to do, failed to pursue, because at that moment that petitioner is incompetent, then that is a residual impact. It carries over because we can't articulate what more could have been done because as it stands this man is incompetent. We don't know whether he's come in and out of competence throughout the time he's been in prison because we wanted an expert to evaluate him to get some sort of a barometer on where he is, but we never got that far. We'd like to go back and do that. The way you present it is unusual, but it's often the case when these get to federal habeas that the trial counsel for the defendant has passed away. That's not an unusual situation, and that makes it difficult for federal habeas counsel to get the information they need to perhaps develop claims, and that's just reality. It doesn't create an additional claim because of that development. But you still have the benefit of the client being there. In this case, not only has trial counsel passed away, but for all intents and purposes the client's in a coma and can't communicate with you. Has the trial counsel passed away? No, no, I'm making an analogy. We have one of the two people just as we do in the hypo. We do. We have the client, but the client can't communicate, Judge. No, we have the trial counsel. We do, but to go back to simply say to the trial counsel, did you do everything that you should have done on Wiggins? Yes, I did. You also have devosed family, right? You can go talk to family members and say, tell us about his childhood, what happened in his life. We do, but all good mitigation work originates with the defendant, as Mr. Kretzer very aptly noted. Well, that's not true, with great respect, because we have several cases up here where the defendant has specifically instructed counsel not to do any mitigation, and they do, and they do a fine job of it. So that's not always the case. I think there needs to be at least a communication, a level of discourse between the client and the attorney to determine. So you're asking, this seems to me beyond what we can do as a habeas court, because there's no recognized right to be competent during state habeas proceedings. Regrettably, there isn't. So I don't see how the state court violated clearly established Supreme Court law. Well, it did in this respect, and I know that Ryan was brought up and that there's no indefinite stay that could be considered, and I understand that. But I think that Ryan is somewhat distinguishable because Ryan dealt with a federal habeas stay. Ryan dealt with a case that had exhausted all state remedies, was in federal habeas stage, and counsel asked for a stay until competence could be regained. That is a pure record review, because in federal habeas, we can't go outside the state record. So the judge made a very apt conclusion that I'm not going to indefinitely stay this because the attorney could review the case, could review the record. But here we have a situation. We don't know if he's ever going to be confident. We don't. So how could we say that the state court clearly erred or that counsel was ineffective for not asking for a stay? I mean, that's a stretch, it seems to me. It's a difficult situation, and it's a unique situation, but without at least affording us the opportunity to go back and investigate this. You have that opportunity. We don't if we don't have the funding to go have him evaluated, and we don't if we don't have a client competent. Well, I thought everybody agreed he's incompetent. Why do we need to have him evaluated if he's incompetent? Everybody seems to spot you that. All we can say to this court, because we are not trained professionals, is that when he arrived in prison in 2010, TDC found him incompetent to assist his state habeas counsel. Right, so what do you need experts to examine him for? Where does that get you? That's my point. To get a barometer on how he presently is, because if there's any prognosis that his competence could be restored, then we might have an opportunity to go back to him and determine what should have been done by trial counsel in the Wiggins investigation that state habeas counsel should have developed. How much money will that cost? Judge, we proposed in our ex parte motion $7,500 to have a competency evaluation done. We were not asking to reinvestigate the entire case. So why didn't you appeal that? You're appealing the other funding issue on the testimony. Because we felt that that issue is germane to this issue, which is the Martinez claim. But you haven't appealed that. As you know, you can appeal funding issues. They don't involve a COA. You can just straight appeal this. We could, Judge, we could. I think at this juncture we found that the more compelling issue for this court was whether we could go back in the first place. Because the court did give us the opportunity to go back. We did file a successor. However, it was summarily denied. I have no further time. I will yield to the State. Thank you. Good afternoon. Jay Clendenin for the Director. May it please the Court. Paul DeVoe killed six people over the course of one weekend in 2007. That weekend was the culmination of a life of violence, violence that began in the 80s. It included terrorizing just about every girlfriend and wife he ever had, assaulting his own mother and sister, sexually molesting his own daughter. Just weeks before the capital murders in this case, he assaulted. Let me ask you. This is not in the record. I just want to know if you have an answer. Assuming the State were to prevail and you set an execution date, are we going to have a claim he's incompetent to be executed? That would be up to the petitioner, but I think at this point one could assume so. Does the State think he's incompetent to be executed? We don't have any reason to say one way or the other. We haven't evaluated him, and we haven't seen any evidence recently regarding his current state, so we wouldn't have a position on that at this point. Okay. Just wondering how much longer we're going to be fussing over this. I think it's a good point, Your Honor. I think that goes to the point about Martinez, actually, although I'll get to that. So I think it's important first to note that— Well, my point is if the State thinks he's incompetent to be executed, well, anyway, go ahead. Well, I would say that that claim is not ripe yet, and it would become ripe upon the setting of the date, so we're just not at that point yet. But I think that your point about an indefinite stay or the prospect of an indefinite stay is germane to the Martinez issue as well. But the first point is that the Wiggins claim is exhausted. That claim was fully before the State court and denied on the merits. It was fully developed by State Habeas Council with the benefit of, I think, over a dozen affidavits from family members, a mental health expert, a mitigation specialist who was given over $13,000 to conduct a mitigation investigation, and she compiled an 80-page report about mitigation. So the claim is fully developed, is fully exhausted, so Martinez doesn't have any applicability to the Wiggins claim at all to begin with. But even if this court was to take up the issue of whether Martinez could apply to it and could apply in this competency context, it doesn't apply there either. Martinez was concerned about the danger of forfeiting trial errors, and that includes trial counsel errors. So a proper Martinez claim regarding competence would allege that State Habeas Council failed to raise a claim alleging that trial counsel failed to raise a competency issue at trial. That's not what we have here. We have a claim about what State Habeas Council failed to do during the State Habeas proceedings. But I think the fact that State Habeas Council did pursue that issue has been lost to this point in argument. State Habeas Council obtained mental health expert assistance from Dr. Hamlin, who evaluated DeVoe during the State Habeas proceedings and found him incompetent. And State Habeas Council actually asked for an injunction of the State Habeas proceedings due to that incompetence. So even if Martinez could apply here, which it doesn't, State Habeas Council did all they could do. There is no right under state law or federal law to competence during State Habeas. Nonetheless, State Habeas Council tried what they could and did their best efforts to do, and that's raise the issue for preservation. It's no fault of theirs that there was no legal issue to raise. They did all they could do. So there's no effective assistance of State Habeas Council, which is a requirement under Martinez. So the claim, Martinez just doesn't apply because of that reason. It's exhausted. State Habeas Council did all they could do. But even if the Court could delve further into the point that's been raised about the principles of Martinez and when it applies and when it doesn't, the Court in Davila made it pretty clear why it applies or why it doesn't. And this issue of competence, I think the analog is in Davila, the Appellate Council issue that Justice Thomas discussed. The reason Martinez doesn't extend to those claims is because, one reason, is because with Appellate Council claims, one court would have already addressed the issue, that being the trial court at least, if not an appellate court. Here with competence, Davila's competence has already been addressed by a court, and that was the trial court. And he was rendered competent in the trial while competent. So under the rubric and the principles of Davila and Martinez, that's already happened. So even the rationale wouldn't extend, even if the Court could take up this radical extension of Martinez. And also the systemic costs of extending Martinez. Judge Owen, I think it's a point that you were making about the indefinite stay prospect here. While it's true probably that not many inmates or defendants could raise a similar fact pattern here, where he was incompetent before trial, rendered competent, stood trial, and later became incompetent again. There would still be systematic costs to the courts, and that's this indefinite stay and periodic rechecking of competence and the cost against finality. You're going to have that if he's incompetent to be executed. That's not what I was getting at. We were deferring a finality determination on a habeas issue indefinitely. Regardless of what it's for, the state's going to have it. It's not so much a question of cost. It's a question of getting the issues resolved. We're not required, even under their theory of the law, to wait forever. Right. I think that's true. But with competency to be executed, that's a discrete issue that arises at a certain point in time. But you're still going to have to, I mean, your scenario could play out in that situation, retest, retest, retest. I wasn't thinking about that. Well, I guess conceivably it could become a Panetti-type case. But for one, I wouldn't foresee that, but that's an entirely separate issue. That's a due process issue that's entirely separate from what we're talking about. I'm not talking about Panetti. I'm saying assuming he is incompetent to be executed, you would be in the scenario that you described that he would have to be tested periodically to see if he became competent to be executed. And I wasn't thinking about the state's cost or any of that. That was not the point of my question. I was just saying you misunderstood what I was thinking. Sure, sure, understood. But I think that competency to be executed issue, for one, is not before the court now. But I think that the concern, though, I think is germane to the Martinez issue, and I think that would weigh against extension of the Martinez exception to this claim. Like I said, Wiggins' claim is just exhausted, so the Martinez exception just has no applicability to it. And the points that Judge Elrod, you made about trial counsel's investigation, I think, is well taken. The trial counsel took an expansive approach to mitigation that included evaluations by, I think, five mental health experts, two of which did not testify, one of whom agreed that DeVoe was a future danger, and a number of family members of DeVoe's. And I think it was you, Judge Costa, that made the point that mitigation investigation, it doesn't necessarily require the defendant's competence because at this point, and even in 2009 when the trial happened, the path was pretty well worn about what the mitigation investigation looked like, and that requires consultation with the defendant's family, mental health experts, obtaining records from schools and hospitals, jails and prisons, and that was all done here. So I think the marginal benefit of talking to the defendant, there would be very little benefit to be gained if a rule was to be created that would require the petitioner's competence during the habeas proceedings. So I think that's another reason why the rationale of Martinez would not extend to this claim. DeVoe raises two other claims regarding state's witnesses that we haven't talked about much today. One issue with regard to AP Marillat is the funding issue, and I think there might be some confusion about the funding request in the district court. The petitioner asked for funding with regard to a due process claim with regard to AP Marillat, not an ineffective assistance claim. So even with regard to the funding issue, there's no Martinez issue raised here before the court because that wasn't raised in the court below. I think that all the claims with regard to AP Marillat can be disposed of based on the fact that the state court denied them on the merits. Marillat provided a comprehensive and thorough affidavit rebutting all the allegations of falsity in his testimony. The petitioner has not rebutted those assertions by AP Marillat, which the state court found credible, and there's no proof of any falsity in his testimony. As to the funding issue, what about the ISDIS case that the Supreme Court is going to decide next term? Well, it doesn't apply no matter what. I would say for a number of reasons. One, like I said, the funding motion was not based on an IAC claim, and ISDIS is based on an IAC claim under Martinez. So since Martinez does not apply to a due process claim, which is which claim the petitioner was asking for funding on, ISDIS could not apply to it. But might it give more guidance just about the threshold level at which funding is warranted? Because here the court, just like the district court in ISDIS did, it did say I'm not going to give you funding in part because I think these claims are meritless, are going to fail, et cetera. I think it can make clear whether or not funding, or under what circumstances, funding is available to show cause and prejudice, which I think there is somewhat of a lack of precedent on that point. But at this point, that's not relevant for this claim because that claim is exhausted, both the due process claim with regard to Merillat and the ineffective assistance claim regarding Merillat. So, like I said, Martinez would have no exception or no application here because the claim is exhausted and the due process claim is exhausted and Martinez doesn't apply to it. So you're saying that ISDIS applies to prejudice and this is barred on exhaustion. That there are two different rubrics that they're being evaluated on. That's true. ISDIS is strictly on a defaulted claim. And the issue is whether the court can look to say that there wouldn't be prejudice and what the standard is for that. I think funding might also have something to do with cause. But it's under that Strickland rubric, not on exhaustion rubric. Right, exactly. It's not a question of whether a claim has been rendered unexhausted through new evidence. It's just on whether cause and prejudice can be shown and under what circumstances funding is necessary to make that showing. But like I said, here we have a merits determination by the state court on the Merillat claim, which renders Martinez and whatever opinion the Supreme Court issues in ISDIS inapplicable. Wasn't Judge Sparks' first reason that they couldn't establish cause? Because there was a failure to object to the testimony at trial, which is why it was procedurally defaulted, right? Right. And so I thought Judge Sparks' first reason was I'm not going to give funding because it was procedurally defaulted by trial counselor's failure to make a contemporaneous objection. And I don't see any cause. So it does seem to me that first reason, now he gave others, but the first reason does seem like it's what's in play in the Supreme Court. That's true. Well, I don't think it makes it relevant to ISDIS, but at the point in time when Judge Sparks made that ruling, he based it on both the default and the merits premise. The merits premise would mean that under Penholster, no new evidence could be presented to render that claim meritorious. And the alternative merits decision by the state court imbues the claim with ADPA deference, which means that Penholster does apply and no new evidence can be presented to support it. So although the initial reason to deny funding was based both on default and merits, by the time Judge Sparks issued his opinion, he addressed only the merits issue. And this court has encountered a pretty similar circumstance in Kretsinger v. Stevens, saying that a district court does not abuse its discretion in making an initial finding on default and denying funding on that reason and then later choosing only to address the merits. And I think that's important here is that we're on an abusive discretion review, and like I said, the state court's alternative merits decision was an adequate ground on which Judge Sparks could and should deny funding. And also, moving on to Dr. Coons, the other witness who the petitioner takes exception with, like we say in our brief, Dr. Coons' testimony was admissible under both federal law and state law. The state court made an explicit determination of state law in this case, and that decision is binding on this court. And in terms of federal law, Barefoot v. Estelle is directly binding and indicates that his testimony was admissible. Can you address the issue that there are several of the concurrence regarding that in the state court and whether that has any play in the joint, so to speak? Sure. So Dr. Coons, the claim with regard to Dr. Coons is that his testimony was not admissible under the Texas Rules of Evidence for being insufficiently reliable. In Coble, the case relied upon by the petitioner, the CCA did find that Dr. Coons' testimony in that case was not reliable, but that was with a separate and distinct fact pattern. In that case, Coble had been initially evaluated by Dr. Coons and then retried 20 years later. And during that time, Dr. Coons had forgotten about the evaluation. He had no independent recollection of it. He lost all of his notes. Yet he still rendered an opinion at trial about Coble. And the CCA held that that was insufficiently reliable and admissible under state law. Even then, the CCA said that his testimony was admissible under federal law. The three concurring judges in this case stated or indicated that they would have held his testimony was not admissible under state law. I think it's important to note again here that we're on a COA application, which means that to be entitled to a COA, DeVoe has to show that the district court's denial of the claim is debatable. Merit's determination is debatable only with the showing of harm and prejudice. And here, the three concurring judges apparently believe that his testimony was not admissible, which apparently means that they thought there was error in the trial. But they agreed that there was no harm. So I think that the fact that they concurred, although they might have disagreed as a matter of state law and admissibility, I think the fact that they concurred actually supports the denial of the COA because they agreed that there was no harm. Like I said, the showing of debatability required both error and harm, and they agreed there was no harm. So no jurists at this point have debated the merits of that claim. So for that same reason, I think a COA should be denied. And even on the debatability of whether it was admissible or not, where the disagreement was, and we have to consider that with the AEDPA deference, right? The question is whether jurists could now disagree that it was unreasonable for the state to reach the decision it does, and there was reasonable disagreement on that point in the state court. So it's tough to show that it was unreasonable for the one side that came out the way it did. I think it's true. The AEDPA deference would apply to the claim, and the fact that they all agreed, all judges agreed on the harm problem, I think would show that it's not unreasonable for that court to deny it. DeVos set out to kill his ex-girlfriend, Glenda Purcell, and her parents. He failed to do that, but what he did do was he killed another ex-girlfriend, two teenagers, one of whom he apparently has some affection for, an elderly woman, Betty DeHart, in Pennsylvania, and two strangers. Given the facts of the case, given the facts of his history of violence, no jury, given those facts, would find that he was not a future danger. For those reasons, we ask that the court deny COA and affirm the district court's denial of funding. Thank you. Before I get to the Davila-Martinez issue, I think I heard the State say something with their answer to the question Judge Costa asked about the funding issue. That's somewhat alarming. I think what the State said was that if I file a motion for funding and say I need an expert to help me out to develop a potential due process claim, that expert gives me a report or facts or whatever. It's my job as the lawyer to then say this impinges on, be it an ineffective assistance claim, due process, whatever else I think it is. That was a very important fact in law. When I get a habeas case, what we usually ask the district court to do is we get the State to agree, in almost every case I've ever had, to agree to the scheduling order. Partly to make sure we don't run into any problem with the deadlines, and partly we want to be on a certain timetable to make sure we have the funding request in by the time the judge wants to hear it. So I do an initial review of the case, and I file a funding request as per the scheduling order, and say these are the potential issues. But I've never heard anything say that if I file a funding request and I happen to say this appears to me, based on my initial review and meeting with the client, to impinge on due process, and it later turns out that is alternatively or in addition a Sixth Amendment claim, that I'm somehow a stop from using the expert's report or whatever he gives me pursuant to the funding to then substantiate that alternative claim. So I think, as you asked before and the panel writes the opinion, I think what the State just suggested is somewhat dangerous. I don't know that a federal habeas lawyer, when they get a case and do their initial review, needs to be able to anticipate any potential legal theory or be a stop from using the expert funding for that purpose later on. That would very dangerously cabin what the federal habeas lawyer can do, based on how they happen to phrase the funding request, or what everyone will do if that's the ruling, is now everyone will list a laundry list of every potential legal theory to make sure they're not trapped by this new rule. So I think that's a very precarious legal proposition, no matter how ISDIS turns out. But you're not saying the opposite, that you shouldn't have to tell the district court that you need the funding for a particular reason. Of course, yes. And that if you can't articulate, and if the court says, oh, you don't need it for due process, because due process for whatever reason, and you really think you need it for ineffectiveness of counsel, assistance of counsel, that you don't need to go back to the district court and say, well, we really needed that for this. Sure. Well, obviously, certainly advocates have a duty of candor to the court. I'm not saying one should mislead why they need it. No, not to mislead, but you need to let the district court know why you need it, so that when you take them up on appeal, we can evaluate whether the district court had an opportunity to consider the reason you asked for the funding. Sure. And so the claim judge already has broadly or narrowly defined the need for funding. If the need for funding is to develop a claim regarding this problematic testimony of A.P. Merillat has been reversed in other cases, that might then separately granulate or impinge on due process and effective assistance that lawyers didn't do with regard to it. But I've never seen a case that says if you, in your initial review, say that it's due process and you get the funding, then you assume you got the funding, you get the expert report, that the state could then come back and say, oh, no, you're stopped from using that. It can't be considered. That's not the reason the district court granted the funding. What happens is the district court enters into order, produces C.J. 21, and then the expert does his job. But that's the job of the lawyer, I would think, to decide. But legal theories arise out of the factual basis. Judge Gossett, to respond to the question you asked me before I sat down before, whether or not there's ineffective assistance of the state habeas counsel, there's no dispute that there's not a freestanding claim of ineffective assistance of the state habeas counsel. But the court, going back to Martinez, was very clear, quote, the fact that the prisoner had no lawyer in the initial state habeas proceeding, parentheses, or his lawyer in that proceeding was ineffective, close parentheses, constitutes grounds for excusing the procedural default. So I don't think even the state would contend that under Davila that there's now no requirement or ability to show a deficient performance by the state habeas counsel. That deficient performance by the state habeas counsel has to be tethered to an underlying deficiency by the trial counsel. W.I. just says that the underlying claim can't be an effective assistance of appellate counsel. That's correct. It has to be an effective assistance of trial counsel. Let me ask you a procedural question. The Supreme Court has criticized our court, at least some members of the court, for creating too high a threshold at the COA level compared to other circuits, the 11th in particular. I'm curious practically. I mean, we've had your briefs thoroughly discuss this. We've had a thorough, robust discussion today. Let's say we were to decide that some of these claims are debatable and issue a COA on one or more of them. And if that's the case, we need to do that because that's what the law says, and procedures are especially important in a case like this. But practically speaking, what more, if we get to that point, what more would you have to see? You'd get a chance to fully brief the COA-granted issues. But what, I mean, how much more is there for you to say? Sure. And I think, if I remember correctly, I think the first Miller-Ell opinion was all the way back in 2003, so there's no doubt it's a debate that's gone on for some time. And, of course, in a death case, there's doctrine. If it's even closely debatable, we should hear inside giving the COA. There's any number of reasons. I mean, in my court test case, the panel specifically said you could rely on your lower existing briefing, but you have this in such a period of time if you want to. And, of course, we blew it up much bigger. At that point, if the panel tells me you get a COA on this one claim or these two claims, then it would be kind of like a merits brief. The difference between an absurd petition and a merits brief in the Supreme Court. We get a lot more authority. We can really dig down. I think on our Merillat claim in particular, we had so many instances where we wanted to disagree with what he said at trial. I think I said we had space limitations here. Here's where we identified it in the state writ. So, obviously, if you grant me a COA there, I think it's the full 12,000 words. But whatever it is, then, obviously, I can blow up and focus more closely on what those are and provide you a lot more authority from treatises, scholars, other circuits, things of the nature, and really go much deeper into it. In a case like this, obviously, you have a massive record, so the more complicated it is, the more we have to simplify it. If you grant a COA, we'll get you a much more thorough piece of briefing to, as per the dictates of the COA, to aid the decisional process. Okay. Thank you, counsel. We have your argument. Thank you very much.